641 S.E.2d 446

**Deborah S. DAVIS, Respondent,**

v.

**James Kelly DAVIS, Appellant.**

**No. 4188.**

Court of Appeals of South Carolina.

Heard Dec. 5, 2006.
Decided Dec. 21, 2006.
Rehearing Denied Feb. 26, 2007.

66

Michael David Wood, Patricia O'Neill DeTreville, and James Michael DeTreville, all of Charleston, for Appellant.

William J. Clifford, of North Charleston, for Respondent.

ANDERSON, J.:

In this domestic action, James Kelly Davis (Husband) appeals the family court's (1) awarding Deborah Davis (Wife) alimony and attorney's fees; and (2) finding Husband in contempt for failure to comply with the family court's orders concerning the distribution of personal property, payment of Wife's equitable share of the marital home, harassment, and communication with Wife about the children's issues. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Husband and Wife divorced on May 7, 2001 after almost twenty-one years of marriage. The couple has three sons.

Wife is a college graduate. At the time of the divorce she had worked in her father's insurance agency, primarily as the office manager, for approximately eleven years. Father retired in December, 2001 and Wife began working as a library media specialist at a middle school for a yearly salary of $31,000. She anticipated a $2000 yearly salary increase upon completion of her master's degree. In addition, Wife intends to become certified by a national board, for which she expects a $7500 yearly increase in salary. Her present income is supplemented with earnings from a part time job with Weight Watchers.

When Father retired, Wife's earnings from her work at Father's agency were near $85,000. Wife testified her income was inflated as a result of the father-daughter relationship. She enjoyed a flexible work schedule and the use of a company car. Father first mentioned his upcoming retirement in 1999, prior to Husband and Wife's divorce. Husband and Wife planned for Father's impending retirement by starting a gift basket business called Baskets of Fun. This venture was ultimately unsuccessful.

Wife explained that jobs available to her in the insurance industry would require extended periods of travel and would start at a salary of approximately $40,000 per year. She estimated her services while working in Father's business were worth $50,000 a year to a comparable insurance agency.

Husband formerly worked at Forsberg Engineering, where he earned an annual salary of $75,000, plus bonuses that

brought his total yearly earnings to approximately $100,000. Prior to Father's retirement, Husband left Forsberg and began a land surveying business, Absolute Surveying, in which he currently holds a thirty-five percent interest. On his financial declaration he indicated an annual salary of $51,000. In addition to his salary, Absolute Surveying provided Husband with a car, car insurance and maintenance, gas, health insurance, health club, cable, and credit cards. The family court determined the value of those benefits amounted to $1100 monthly. Partnership distributions from Absolute averaged $1,333.33 per month. Husband had other real estate partnership interests which he failed to include on his financial declaration. Those interests yielded $35,000 from the sale of real property in 2002 and reflected an average of $10,000 equity in each of ten (10) condominiums.

The family court approved and adopted the parties' agreement on "all issues arising from the marriage, save and except the issue of divorce," in the March 12, 2001 divorce decree. Terms of the agreement relevant to Husband's appeal included a provision for joint legal custody of their three sons and the requirement that each party keep the other informed about matters concerning the children. The litigants were restrained from harming, harassing, bothering or otherwise disturbing each other, whether at their respective residences, employment, or the like. The marital home would be the sole property of Husband and, for the purpose of equitable distribution, valued at $325,000. The home was to be refinanced to provide funds for Wife's equitable share. Husband was permitted to subtract from the $325,000 valuation of the home the first mortgage payoff, reasonably necessary closing costs, and the balance of Wife's equity loan. In addition, Husband was directed to pay Wife fifty percent of settlement proceeds from Forsberg Engineering no later than the refinance closing date. Wife was entitled to obtain from Husband certain items of personal property, and the parties were instructed to cooperate in the expeditious transfer of those items. The parties agreed to reserve the issue of alimony for a five year period, during which either party could assert a claim for alimony against the other.

Wife filed a complaint on December 10, 2001, and an amended complaint on February 19, 2002, seeking $1000 per

month alimony. During the pendency of this litigation Wife initiated a number of enforcement actions based on Husband's non-compliance with the divorce decree. In its final ruling the family court awarded Wife $635 per month in alimony, adjusted to be retroactive from the date of the temporary hearing. In addition to noting its concern over the absence of Husband's forthrightness regarding his income, the family court found Husband in contempt for failure to: (1) provide Wife with copies of family photographs, (2) pay Wife her equitable share of the marital home, (3) refrain from harassing Wife, and (4) communicate with Wife regarding issues with their children. Wife was awarded attorney's fees as well.

### STANDARD OF REVIEW

In appeals from the family court, this court may find facts in accordance with its own view of the preponderance of the evidence. *Nasser–Moghaddassi v. Moghaddassi*, 364 S.C. 182, 189, 612 S.E.2d 707, 711 (Ct.App.2005) (*citing Emery v. Smith*, 361 S.C. 207, 213, 603 S.E.2d 598, 601 (Ct.App.2004)). However, this broad scope of review does not require this court to disregard the family court's findings. *Lacke v. Lacke*, 362 S.C. 302, 307, 608 S.E.2d 147, 149 (Ct.App.2005) (*citing Bowers v. Bowers*, 349 S.C. 85, 561 S.E.2d 610 (Ct.App.2002)); *Badeaux v. Davis*, 337 S.C. 195, 202, 522 S.E.2d 835, 838 (Ct.App.1999). Nor must we ignore the fact that the family court judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Scott v. Scott*, 354 S.C. 118, 124, 579 S.E.2d 620, 623 (2003) (*citing Woodall v. Woodall*, 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996)). However, our broad scope of review does not relieve appellant of the burden of convincing this court the family court committed error. *Nasser–Moghaddassi*, 364 S.C. at 190, 612 S.E.2d at 711 (*citing Skinner v. King*, 272 S.C. 520, 522–23, 252 S.E.2d 891, 892 (1979)).

### LAW/ANALYSIS

#### I. Agreement

Husband argues the family court failed to effectuate the parties' intention as found within the agreement with regard to the reservation of alimony. We disagree.

■■ In South Carolina, the construction of a separation agreement is a matter of contract law. *Estate of Revis by Revis v. Revis,* 326 S.C. 470, 477, 484 S.E.2d 112, 116 (Ct.App. 1997). "Where an agreement is clear and capable of legal construction the court's only function is to interpret its lawful meaning and the intention of the parties as found within the agreement and give effect to them." *Bogan v. Bogan,* 298 S.C. 139, 142, 378 S.E.2d 606, 608 (Ct.App.1989). "In the enforcement of an agreement, the court does not have the authority to modify terms that are clear and unambiguous on their face." *Messer v. Messer,* 359 S.C. 614, 621, 598 S.E.2d 310, 314 (Ct.App.2004). "Where an agreement has been merged into a court's decree, the decree, to the extent possible, should be construed to effect the intent of both the judge and the parties." *Id.* at 628, 598 S.E.2d at 318 (*citing McDuffie v. McDuffie,* 308 S.C. 401, 409, 418 S.E.2d 331, 336 (Ct.App. 1992)). "A court approved divorce settlement must be viewed in accordance with principles of equity and there is implied in every such agreement a requirement of reasonableness." *Ebert v. Ebert,* 320 S.C. 331, 340, 465 S.E.2d 121, 126 (Ct.App. 1995) (*quoting* 17A Am Jur.2d *Contracts* 479 (1991)).

Unambiguous marital agreements will be enforced according to their terms.... The court must enforce an unambiguous contract according to its terms, regardless of the contract's wisdom or folly, or the parties' failure to guard their rights carefully. To discover the intention of a contract, the court must first look to its language—if the language is perfectly plain and capable of legal construction, it alone determines the document's force and effect.

*Heins v. Heins,* 344 S.C. 146, 158, 543 S.E.2d 224, 230 (Ct.App.2001) (*citing Lindsay v. Lindsay,* 328 S.C. 329, 491 S.E.2d 583 (Ct.App.1997)); *Ebert v. Ebert,* 320 S.C. 331, 465 S.E.2d 121 (Ct.App.1995); *Ellis v. Taylor,* 316 S.C. 245, 449 S.E.2d 487 (1994); *Superior Auto. Ins. Co. v. Maners,* 261 S.C. 257, 199 S.E.2d 719 (1973).

■■ On the other hand, when an agreement is susceptible of more than one interpretation, it is ambiguous and the court should seek to determine the intent of the parties. *Estate of Revis,* 326 S.C. at 477, 484 S.E.2d at 116. Whether or not an ambiguity exists in an agreement must be determined from the language of the instrument. *Steffenson v.*

*Olsen,* 360 S.C. 318, 322, 600 S.E.2d 129, 131 (Ct.App.2004); *Lindsay v. Lindsay,* 328 S.C. 329, 491 S.E.2d 583 (Ct.App. 1997). "An ambiguous contract is one capable of being understood in more ways than one, an agreement obscure in meaning through indefiniteness of expression, or having a double meaning." *Estate of Revis,* 326 S.C. at 477, 484 S.E.2d at 116 (*quoting Ebert,* 320 S.C. at 338, 465 S.E.2d at 125).

The exact language of the agreement adopted in the divorce decree reads, in pertinent part:

> The parties agree to reserve the issue of alimony, each from the other, for a period of 5 years from the date of this hearing. During this 5-year period, either party may elect to assert a claim for alimony. If such a claim is not asserted during this 5-year period, such claim is extinguished when the 5-year period has ended.

A reservation of alimony is recognized as a mechanism to address a set of circumstances that may generate a need for alimony in the future. *Donahue v. Donahue,* 299 S.C. 353, 363, 384 S.E.2d 741, 747 (1989). Here, implicit in the parties' agreement is their intention to prepare for unforeseen circumstances which might generate a future need for alimony by either party. The only contingency established by the plain language of the agreement mandates the claim be asserted within a five year period following the decree. Husband's argument that the agreement is not clear and capable of legal construction is unpersuasive. Contrary to his contention, nothing in the agreement suggests the parties intended to express or imply additional conditions under which alimony may be sought. The terms of the agreement are clear and unambiguous on its face. Moreover, Husband's suggestion the agreement failed for lack of "specifics" to assist the court in the propriety of an alimony claim is without merit. Section 20-3-130 of the South Carolina Code provides the family court with the appropriate guidelines for adjudicating such claims.

Husband next complains the family court improperly reserved jurisdiction to award alimony because an identifiable set of circumstances likely to generate a need for alimony in the reasonably foreseeable future did not exist at the time of the decree. We disagree.

In *Donahue* our Supreme Court announced that where "there is no need for alimony at the time of trial, and no indication of physical or mental illness, foreseeable change in need in the future, or some other extenuating circumstance, the question of alimony should not be reserved." 299 S.C. at 363, 384 S.E.2d at 747. Most frequently our appellate courts have condoned the reservation of alimony when the potential for the occurrence or recurrence of a physical or mental disability existed. *See, e.g., Williamson v. Williamson,* 311 S.C. 47, 50, 426 S.E.2d 758, 760 (1993) (wife had epilepsy since birth and serious problems developed in 1989; the condition could deteriorate in the future); *Stevenson v. Stevenson,* 295 S.C. 412, 415, 368 S.E.2d 901, 903 (1988) (although the court properly denied alimony under the circumstances existing at the time of decree, husband's pre-existing disability entitled him to reservation of alimony); *Lowe v. Lowe,* 256 S.C. 243, 248, 182 S.E.2d 75, 78 (1971) (wife's past emotional problems, which occurred during the course of the marriage, might recur to the point where she would be entitled to alimony). In contrast, this court decided the family court erred in reserving alimony when no indication of a foreseeable need in the future existed. *Hardy v. Hardy,* 311 S.C. 433, 436, 429 S.E.2d 811, 813 (Ct.App.1993). In *Hardy,* the wife was in good health, drawing a pension from the state, and was working part-time.

*Donahue* nevertheless endorses the reservation of alimony where some foreseeable future need or other extenuating circumstance exists. 299 S.C. at 363, 384 S.E.2d at 747. In the instant case the parties implicitly recognized that Father's impending retirement was likely to generate a need for alimony in the reasonably foreseeable future. Wife testified her income from employment in Father's business exceeded her earning capacity because of the father-daughter relationship. Perhaps anticipating an income more in line with her earning capacity, the parties agreed to reserve an opportunity for re-evaluating their respective needs for a period of time after the divorce.

Furthermore, the reservation of alimony in this case was accomplished pursuant to the parties' agreement. In the pivotal case of *Moseley v. Mosier*, our Supreme Court declared parties to a divorce "may agree to any terms they wish as long as the court deems the contract to have been entered

fairly, voluntarily and reasonably." 279 S.C. 348, 353, 306 S.E.2d 624, 627 (1983).

> The parties may specifically agree that the amount of alimony may not ever be modified by the court; they may contract out of any continuing judicial supervision of their relationship by the court; they may agree that the periodic payments or alimony stated in the agreement shall be judicially awarded, enforceable by contempt, but not modifiable by the court.... With the court's approval, the terms become a part of the decree and are binding on the parties and the court.

*Id.*

Section 20–3–130(G) of the South Carolina Code instructs that the family court may:

> review and approve all agreements which bear on the issue of alimony or separate maintenance and support, whether brought before the court in actions for divorce from the bonds of matrimony, separate maintenance and support actions, or in actions to approve agreement where the parties are living separate and apart.

S.C.Code Ann. § 20–3–130(G) (Supp.2003).

The family court, in issuing the divorce decree, stated "the parties have expressed their desire that their agreement be approved by this Court as being fair and equitable, and that the agreement be adopted by this Court as its own Order." The decree further noted that both parties had been examined under oath as to matters related to the agreement. The litigants understood the agreement and professed it was the product of negotiation and compromise, each confirming that it was fair and equitable.

> Neither party entered into the agreement as a result of any threat, coercion or duress; rather each party entered into the agreement freely and voluntarily; ... the [a]greement set forth ... was entered into knowingly and intelligently by both parties, each having full understanding and appreciation of the consequences of their actions.

The family court concluded the agreement was "clearly within the bounds of reasonableness, and is fair and equitable to both parties...."

According to the plain and unambiguous language of the parties' agreement reserving the issue of alimony, the family court did not fail to effectuate the intention of the parties. The divorce decree was filed on May 9, 2001, and Wife filed an amended complaint in February of 2002, well within the five year period provided in the divorce decree. The family court did not err by considering Wife's asserted claim for alimony.

## II. Alimony

██ Husband maintains Wife is not entitled to alimony because she intentionally sought and accepted employment below her earning history and potential. We disagree.

██ An award of alimony rests within the sound discretion of the family court and will not be disturbed absent an abuse of discretion. *Dearybury v. Dearybury,* 351 S.C. 278, 282, 569 S.E.2d 367, 369 (2002); *Sharps v. Sharps,* 342 S.C. 71, 79, 535 S.E.2d 913, 917 (2000); *Hatfield v. Hatfield,* 327 S.C. 360, 364, 489 S.E.2d 212, 215 (Ct.App.1997). "Alimony is a substitute for the support which is normally incident to the marital relationship." *Spence v. Spence,* 260 S.C. 526, 529, 197 S.E.2d 683, 684 (1973) (*quoting McNaughton v. McNaughton,* 258 S.C. 554, 558, 189 S.E.2d 820, 822 (1972)); *Johnson v. Johnson,* 296 S.C. 289, 300, 372 S.E.2d 107, 113 (Ct.App.1988). "Generally, alimony should place the supported spouse, as nearly as is practical, in the same position he or she enjoyed during the marriage." *Allen v. Allen,* 347 S.C. 177, 184, 554 S.E.2d 421, 424 (Ct.App.2001). However, "[a]limony should not dissuade a spouse, to the extent possible, from becoming self-supporting." *Rimer v. Rimer,* 361 S.C. 521, 525, 605 S.E.2d 572, 574 (Ct.App.2004). "It is the duty of the family court to make an alimony award that is fit, equitable, and just if the claim is well founded." *Allen,* 347 S.C. at 184, 554 S.E.2d at 424 (*citing Woodward v. Woodward,* 294 S.C. 210, 217, 363 S.E.2d 413, 417 (Ct.App.1987)).

██ South Carolina law provides that the family court judge may grant alimony in such amounts and for such term as the judge considers appropriate under the circumstances. *Smith v. Smith,* 327 S.C. 448, 462, 486 S.E.2d 516, 523 (Ct.App.1997). Factors to be considered in making an alimony award include: (1) duration of the marriage; (2) physical

and emotional health of the parties; (3) educational background of the parties; (4) employment history and earning potential of the parties; (5) standard of living established during the marriage; (6) current and reasonably anticipated earnings of the parties; (7) current and reasonably anticipated expenses of the parties; (8) marital and nonmarital properties of the parties; (9) custody of children; (10) marital misconduct or fault; (11) tax consequences; and (12) prior support obligations; as well as (13) other factors the court considers relevant. S.C.Code Ann. § 20–3–130(C) (Supp.2003); *Hatfield*, 327 S.C. at 364, 489 S.E.2d at 215. The court is required to consider all relevant factors in determining alimony. *Epperly v. Epperly*, 312 S.C. 411, 415, 440 S.E.2d 884, 886 (1994); *see also Patel v. Patel*, 347 S.C. 281, 290, 555 S.E.2d 386, 391 (2001) (finding the trial court's denial of alimony was erroneous because the court did not address "several important factors" when determining no alimony should be awarded). "Our inquiry on appeal is not whether the family court gave the same weight to particular factors as this court would have; rather, our inquiry extends only to whether the family court abused its considerable discretion in assigning weight to the applicable factors." *Allen*, 347 S.C. at 186, 554 S.E.2d at 425. Ultimately, no one factor is dispositive. *Lide v. Lide*, 277 S.C. 155, 157, 283 S.E.2d 832, 833 (1981).

The record reflects that the family court considered the relevant statutory factors. However, Wife's earning history and potential are at the heart of the parties' dispute over alimony. Prior to Father's retirement Wife earned nearly $85,000 annually, but attributed her high salary to the "Daddy" factor. The family court acknowledged this employer-employee relationship was "clearly less than an arm's length transaction." Husband averred Wife could earn between $40,-000–$45,000 in the insurance industry. Instead, Wife returned to work in education at a significantly reduced salary of $31,000, plus health, disability, and retirement benefits. In addition, she began studying for her master's degree. Wife maintained that, taking state benefits into account, upon completion of her graduate degree her earnings would be roughly equivalent to those in the insurance industry. The family court found:

[Wife's] future earnings are relatively predictable as she progresses through her educational process and employment in the field of education. Her gross income will lie between thirty-five thousand ($35,000) and forty thousand ($40,000) dollars when she completes her masters degree and begins being paid at that level.

The evidence indicates Wife's salary near the end of her employment with Father was not an accurate predictor of her earning potential, either in the education or insurance industry. We discern no abuse of discretion in the family court's award of alimony.

## III. Contempt

Husband challenges the family court's finding him in contempt for violation of the divorce decree and subsequent court orders. He contends the evidence failed to demonstrate his conduct was willful, voluntary, and intentional. We disagree.

"The power to punish for contempt is inherent in all courts and is essential to preservation of order in judicial proceedings." *Browning v. Browning,* 366 S.C. 255, 263, 621 S.E.2d 389, 392 (Ct.App.2005) (*quoting In re Brown,* 333 S.C. 414, 420, 511 S.E.2d 351, 355 (1998)). "On appeal, a decision regarding contempt should be reversed only if it is without evidentiary support or the trial judge has abused his discretion." *Stone v. Reddix–Smalls,* 295 S.C. 514, 516, 369 S.E.2d 840, 840 (1988) (citations omitted); *Lukich v. Lukich,* 368 S.C. 47, 56, 627 S.E.2d 754, 759 (Ct.App.2006). "Contempt results from the willful disobedience of an order of the court." *Bigham v. Bigham,* 264 S.C. 101, 104, 212 S.E.2d 594, 596 (1975); *Smith v. Smith,* 359 S.C. 393, 396, 597 S.E.2d 188, 189 (Ct.App.2004); S.C.Code Ann. § 20–7–1350 (Supp.2004) (A party may be found in contempt of court for the willful violation of a lawful court order.).

"A willful act is one which is 'done voluntarily and intentionally with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or disregard the law.'" *Widman v. Widman,* 348 S.C. 97, 119, 557 S.E.2d 693, 705 (Ct.App.2001)

(*quoting Spartanburg County Dep't of Soc. Servs. v. Padgett,* 296 S.C. 79, 82–83, 370 S.E.2d 872, 874 (1988)).

■■■ "In a proceeding for contempt for violation of a court order, the moving party must show the existence of a court order and the facts establishing the respondent's non-compliance with the order." *Hawkins v. Mullins,* 359 S.C. 497, 501, 597 S.E.2d 897, 899 (Ct.App.2004). "[B]efore a court may find a person in contempt, the record must clearly and specifically reflect the contemptuous conduct." *Widman,* 348 S.C. at 119, 557 S.E.2d at 705. "Once the moving party has made out a prima facie case, the burden then shifts to the respondent to establish his or her defense and inability to comply with the order." *Id.* at 120, 557 S.E.2d at 705.

■ "A trial court's determination regarding contempt is subject to reversal where it is based on findings that are without evidentiary support or where there has been an abuse of discretion." *Henderson v. Puckett,* 316 S.C. 171, 173, 447 S.E.2d 871, 872 (Ct.App.1994). "An abuse of discretion occurs either when the court is controlled by some error of law or where the order, based upon findings of fact, lacks evidentiary support." *Townsend v. Townsend,* 356 S.C. 70, 73, 587 S.E.2d 118, 119 (Ct.App.2003).

Wife initiated actions during the pendency of this litigation to enforce Husband's compliance with family court's orders to: (1) distribute certain family photographs or duplicates in a quality equal to the originals; (2) pay Wife's share of the equity in the marital home; (3) refrain from harassing Wife and (4) communicate with Wife concerning children's issues.

### A. Photographs

At trial Husband testified that he provided Wife with a compact disc of photographs, and Wife objected to the format rather than the quality of the photographs. Husband delivered actual photographs to Wife as well. In his testimony he acknowledged differences between the originals and those he tendered to Wife. When asked if he were willing to have exact reproductions from the negatives made by the original photographer in order to discharge the enforcement action, Husband responded:

I don't care to buy photographs for my ex-wife. I'll do what I'm told to do. I provided, according to the order, equivalent, equal—in fact she was able to get them on high quality CD disks. That's the way they provide them now to anybody. She can—actually with the CD I gave her, she can have the pictures made in large sizes, eight and a half by eleven or whatever size you want. That's how good a quality they were scanned at.

In its final order dated filed June 12, 2003, the family court found, "[n]otwithstanding the prior contempt proceeding and resulting order by the Presiding Judge to provide the [Wife] the original photographs or duplicate originals from the original negatives, the [Husband] once again gave the [Wife] a compact disc with inferior reproductions." Consequently, Husband was held in contempt and advised he could purge the charge by turning the original photographs over to Wife within three days of the order. A modified final order filed on July 12, 2004 noted that Husband again gave Wife a compact disc instead of the original photographs or duplicates from the original negatives. Subsequently, the family court held Husband in contempt for failure to comply with its June 12, 2003 order.

## B. Equity in Marital Home

 Wife complains the closing costs charged against her equitable interest in the marital home were inflated, unfair, and unreasonable, and Husband failed to distribute the equity in the home in accordance with the parties' agreement. The pertinent portion of the divorce decree reads:

The equity in the home is subject to division between the parties as follows: [Husband] shall be permitted to subtract from the $325,000 valuation of the home the first mortgage payoff, as well as reasonable and necessary closing costs of refinance and the cost of the equity line taken by Mother. The resulting figure shall be deemed the "net equity" and shall be divided equally between the parties, *with the exception that* the $30,000 second mortgage/equity line shall be deducted from [Wife's] 50% share and reimbursed to [Hus-

band]. The terms and details of refinancing the home shall be at the sole election and responsibility of [Husband].

(Emphasis in original).

Husband referred the closing of the refinancing loan to attorney Eric Davidson, a boyhood friend and partner in Husband's surveying and real estate businesses. Davidson had previously acted on the parties' behalf in earlier closings, but never charged them closing fees. However, Davidson charged the parties a total of $975 in attorney's fees for closing the refinancing of the marital home following the divorce. Additional costs included a survey performed by Husband's company, Absolute Surveying, for $350, with the total closing costs amounting to over $10,000. Davidson's records reflected that he issued a check to Husband refunding Husband's portion of the fees. The family court observed "[i]t appears that this attorney directed material changes to be made to the closing statement used at the refinance of the marital home and these changes resulted in this attorney refunding money only to the [Husband] when, in fact, one half of this money was due to the [Wife]." The family court further enumerated closing costs not fairly charged to Wife "as they inured exclusively to the benefit of [Husband]." Accordingly, after the family court's analysis, $6,839.25 was considered a fair and reasonable charge for the closing costs.

Davidson calculated Wife's share of the home equity by deducting the closing costs, the first mortgage, and the balance on the home equity loan that Wife had used from the stipulated value of the home ($325,000). The resulting net equity was divided in half and Wife's share was again reduced by $30,000 for the home equity loan. When challenged at trial that his calculation resulted in deducting the equity loan twice, Davidson stated this procedure reflected his interpretation of the parties' agreement. Accordingly, the family court instructed the parties to submit post trial briefs on the method of calculating Wife's equitable share. The family court adopted Wife's analysis, which reflected only one deduction of the equity loan from her share of the net equity. The June 12, 2003 final order directed Husband to pay Wife the balance owed her as a result of the re-calculation, $20,689.19. At the time the modified final order was issued in July, 2004, Hus-

band had not paid Wife the balance of her equitable share, and the family court found Husband in contempt.

## C. Harassment

■■■ The divorce decree provided that "both parents will be restrained from harming, harassing, bothering or otherwise disturbing each other, whether at their respective places of residence, employment or the like."

Wife submitted evidence of incidents during which Husband harassed her by threatening to publish embarrassing photographs of her, by discussing her personal life with the minor children, and by making harassing phone calls. Additionally, testimony indicated Husband and their youngest son went to Wife's home late one evening when Wife's boyfriend was present. Husband later accused Wife of exposing the child to immoral behavior. Wife recounted another incident that arose when Husband returned personal property to her in the parking lot of her church, causing a disturbance by shouting obscenities at her in the presence their youngest son.

In its final and modified final orders, the family court found Husband's actions "constituted harassment in violation of the Court's prior order."

## D. Communication

Pursuant to the divorce decree, the parties were required to keep each other informed about matters concerning the children and to consult with each other on matters which pertained to the children's interests. The family court noted, however, that Husband admitted two incidents when the children were involved with law enforcement. Despite repeated requests, Husband would not disclose the charges or degree of involvement to Wife.

In each of the four instances of alleged contemptuous conduct, the existence of the divorce decree and subsequent orders of the family court requiring Husband's compliance is without dispute. Testimony at trial and supporting affidavits provide further evidentiary support that Husband failed to accomplish what the law required of him. Furthermore, by the time the modified final order was issued in July, 2004, nearly one year after the family court's final order, Husband

still had not paid Wife the balance of her equity in the marital home or provided her with required photographs. Husband's failure to comply with all the family court's directives indicates his conduct was willful, voluntary, and intentional. His defense amounts to a general denial that any evidence existed of wrongdoing concerning the photographs, harassment, and communication charges. Husband professes he neither intentionally nor voluntarily inflated the closing costs charged against Wife's interest or miscalculated her equitable share of the marital home. He asseverates that, because he referred the entire transaction to the closing attorney, Husband was not responsible for the inequitable result. Additionally, Husband urges the closing attorney's calculation of Wife's equitable share was a reasonable interpretation of the language of the divorce decree and does not rise to the level of willful disobedience.

Husband's protestations are unavailing. The family court adopted Wife's method for calculating her equitable share after being briefed by both parties' on their respective interpretations. Furthermore, because the parties' agreement was adopted and incorporated into the divorce decree in its entirety, it was incumbent on the family court to effectuate not only the intention of the parties, but the intention of the presiding family court judge who issued the decree. *See Messer v. Messer*, 359 S.C. 614, 628, 598 S.E.2d 310, 318 (Ct.App.2004) (agreement adopted as divorce decree should be construed to effect intent of both judge and parties). Apodictically, it strains credulity to infer the presiding judge intended for Wife's equity loan to be deducted from her share in the net equity twice.

We conclude ample evidence existed to support the family court's contempt findings on all four issues.

### IV. Sidebar Conference

Husband asserts the family court erred by referencing a sidebar conference in its final and modified final order. We agree.

Sidebar conferences without the presence of a court stenographer, must be reiterated for the record. *North Charleston*

*v. Gilliam,* 311 S.C. 252, 254, 428 S.E.2d 720, 721 (Ct.App. 1992).

The modified final order addresses the sidebar solely in part seven (7) of the Alimony section. The order states:

It is noted that the Court expressed its concern in a side bar conference which is not referenced about [Husband] lying to the Court in an attempt to make it appear that he had far less income and benefits available to him than he actually had. The Court advised counsel that this matter, in all likelihood, would be referred to the Solicitor to determine if a charge of perjury was warranted. It was only then that the [Husband] submitted an amended financial declaration.

The sidebar conference referred to by the family court was not reiterated for the record. However, the erroneous mention of the sidebar does not amount to reversible error. "An error not shown to be prejudicial does not constitute grounds for reversal." *Brown v. Pearson,* 326 S.C. 409, 417, 483 S.E.2d 477, 481 (Ct.App.1997). "An error is not reversible unless it is material and prejudicial to the substantial rights of the appellant." *Visual Graphics Leasing Corp., Inc. v. Lucia,* 311 S.C. 484, 489, 429 S.E.2d 839, 841 (Ct.App. 1993).

We caution the Bench in regard to the utilitarian efficacy of a sidebar conference. An objection made during an off-the-record conference which is not made part of the record does not preserve the question for review. *York v. Conway Ford, Inc.,* 325 S.C. 170, 173, 480 S.E.2d 726, 728 (1997); *Benton v. Davis,* 248 S.C. 402, 410, 150 S.E.2d 235, 239 (1966); *State v. Fletcher,* 363 S.C. 221, 250, 609 S.E.2d 572, 587 (Ct.App.2005). However, it is sufficient if the party puts the grounds or arguments and the trial judge's ruling in the record at a later time during the trial. *See State v. Hamilton,* 344 S.C. 344, 361, 543 S.E.2d 586, 595 (Ct.App.2001) *overruled on other grounds State v. Gentry,* 363 S.C. 93, 610 S.E.2d 494 (2005); *State v. Bostick,* 307 S.C. 226, 228, 414 S.E.2d 175, 176 n. 1 (Ct.App.1992); *see also City of North Charleston v. Gilliam,* 311 S.C. at 254, 428 S.E.2d at 721 (rulings made buy trial judge at sidebar conferences without presence of court reporter may still be preserved for appellate review if they are

reiterated for the record when the case is called for trial or trail resumes).

In this case, the family court's error concerned extrinsic material and did not affect the court's actual ruling. The error is without prejudicial effect and, therefore, harmless.

## V. Attorney's Fees

■ Husband alleges the family court erred in awarding Wife attorney's fees. We disagree.

■ "The Family Court is authorized by statute to order payment of suit money, including attorney['s] fees, to either party in a divorce action." *Stevenson v. Stevenson*, 295 S.C. 412, 415, 368 S.E.2d 901, 903 (1988). Section 20–7–420(A)(38) (Supp.2005) of the South Carolina Code provides: "[s]uit money, including attorney's fees, may be assessed for or against a party to an action brought in or subject to the jurisdiction of the family court."

■ An award of attorney's fees lies within the sound discretion of the family court and will not be disturbed on appeal absent an abuse of discretion. *Patel v. Patel*, 359 S.C. 515, 533, 599 S.E.2d 114, 123 (2004); *Bowen v. Bowen*, 327 S.C. 561, 563, 490 S.E.2d 271, 272, (Ct.App.1997). The family court, in determining whether to award attorney's fees, should consider each party's ability to pay his or her own fees, the beneficial results obtained, the parties' respective financial conditions, and the effect of the fee on the parties' standards of living. *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). In determining the reasonable amount of attorney's fees to award, the family court must take into account the nature, extent, and difficulty of the services rendered, the time necessarily devoted to the case, counsel's professional standing, the contingency of compensation, the beneficial results obtained, and the customary legal fees for similar services. *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991); *Lanier v. Lanier*, 364 S.C. 211, 222, 612 S.E.2d 456, 461–62 (Ct.App.2005); *see also Messer v. Messer*, 359 S.C. 614, 633, 598 S.E.2d 310, 320 (Ct.App.2004) (refusing to find an abuse of discretion as to award of attorney's fees when the family court analyzed each of the factors, detailed its findings in its final order, and those findings were supported by affidavits).

Applying the *Glasscock* factors, the family court noted this litigation involved multiple issues, lasted five days, and transpired over a three month period. Wife's attorney has been a member of the South Carolina Bar since 1978, his fees were consistent with legal fees for similar services, and Wife obtained a beneficial result. Moreover, Wife's financial circumstances necessitated an award of attorney's fees. The family court evaluated the reasonableness of Wife's attorney's fees and costs, her attorney's extensive experience and standing in the Bar, and the number of hours involved in this litigation against the backdrop of Husband's failure to comply with the provisions of the divorce decree and his failure to accurately report income in his financial declaration. We, therefore, affirm the family court's award of attorney's fees.

## CONCLUSION

For the reasons stated herein, the family court's decision is **AFFIRMED.**

HUFF and WILLIAMS, JJ., concur.